QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Shon Morgan (Bar No. 187736)
  shonmorgan@quinnemanuel.com
  John W. Baumann (Bar No. 288881)
  jackbaumann@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Epson America, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| NICOLE AARON, *et al.*,<br><br>              Petitioners,<br><br>       vs.<br><br>EPSON AMERICA, INC.,<br><br>              Respondent. | CASE NO. 8:24-cv-01712-FWS-DFM<br><br>**RESPONSE TO VERIFIED CONSOLIDATED PETITION TO COMPEL ARBITRATION AND FOR SANCTIONS**<br><br>Date:     January 16, 2025<br>Time:     10:00 a.m.<br>Crtrm.:  10D |
| EPSON AMERICA, INC.,<br><br>              Plaintiff,<br><br>       vs.<br><br>GRAESEN ARNOFF, *et al.*,<br><br>              Defendants. | The Hon. Fred W. Slaughter<br><br>Trial Date:         None Set |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ................................... 2

ARGUMENT ........................................................................................ 14

I.     BEFORE COMPELLING ARBITRATION, THIS COURT MUST DECIDE THRESHOLD ISSUES CONCERNING WHICH EULA APPLIES AND WHETHER PETITIONERS COMPLIED WITH PRE-FILING DISPUTE REQUIREMENTS ........................................... 14

II.    THE EVIDENCE ADDUCED TO DATE CONFIRMS AT LEAST 639 PETITIONERS HAVE NO RIGHT TO ARBITRATION IN JAMS .......................................................................................... 16

III.   DISCOVERY IS REQUIRED AS TO AT LEAST ALL REMAINING 2,452 PETITIONERS ...................................................................... 17

IV.   THE COURT SHOULD DENY PETITIONERS' STAY REQUEST ........... 19

V.    THE COURT SHOULD DENY PETITIONERS' REQUEST FOR SANCTIONS ............................................................................... 20

CONCLUSION ................................................................................... 21

## **<u>TABLE OF AUTHORITIES</u>**

<u>Page</u>

### <u>Cases</u>

*Arnoff v. Epson America, Inc.*,
    No. 8:24-cv-01996-FWS-DFM (C.D. Cal.) .................................................. 7, 11

*Ashbey v. Archstone Prop. Mgmt., Inc.*,
    785 F.3d 1320 (9th Cir. 2015) ........................................................................... 16

*Beltran v. PeopleReady, Inc.*,
    No. 3:23-CV-00179-WHO, 2023 WL 3092973 (N.D. Cal. Apr. 25,
    2023) .................................................................................................................... 18

*Coinbase, Inc. v. Suski*,
    602 U.S. 143 (2024) ..................................................................................... 14, 15

*Concat LP v. Unilever, PLC*,
    350 F. Supp. 2d 796 (N.D. Cal. 2004).......................................................... 16, 17

*Davis v. Shiekh Shoes, LLC*,
    84 Cal. App. 5th 956 (2022)............................................................................... 21

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010) ........................................................................................... 14

*Hansen v. LMB Mortg. Servs., Inc.*,
    1 F.4th 667 (9th Cir. 2021)................................................................................ 16

*Hernandez v. Sohnen Enters., Inc.*,
    102 Cal. App. 5th 222 (2024)............................................................................ 20

*In Re Kia Hyundai Vehicle Theft Litig.*,
    No. 8:22-ML-03052-JVS, 2024 WL 4415204 (C.D. Cal. July 2,
    2024) .................................................................................................................... 19

*Lorber Indus. of California v. Los Angeles Printworks Corp.*,
    803 F.2d 523 (9th Cir. 1986)............................................................................. 19

*Pierre v. IEC Corp.*,
    No. 8:22-CV-01280-FWS-JDE, 2023 WL 3551962 (C.D. Cal. Mar.
    14, 2023) .............................................................................................................. 18

*Powell v. UHG I LLC,*
   No. 23-CV-0086 DMS(KSC), 2023 WL 9503474, *2 (S.D. Cal.
   Dec. 29, 2023) .................................................................................................. 19

*Rice v. Downs,*
   248 Cal. App. 4th 175 (2016) ............................................................................. 16

*Russell v. Siemens Indus. Software Inc.,*
   No. 23-CV-03884-LJC, 2024 WL 4545970 (N.D. Cal. Oct. 21,
   2024) ................................................................................................................... 21

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.,*
   925 F.2d 1136 (9th Cir. 1991) ............................................................................ 17

*Victrola 89, LLC v. Jaman Properties 8 LLC,*
   46 Cal. App. 5th 337 (2020) ............................................................................... 21

## <u>Statutes</u>

9 U.S.C. § 1 ..................................................................................................................... 21

9 U.S.C. § 3 ..................................................................................................................... 20

9 U.S.C. § 4 ..................................................................................................................... 21

Cal. Code Civ. Proc. § 1280 *et seq.* ...................................................................... 20, 21

Cal. Code Civ. Proc. § 1281.97 .............................................................................. 20, 21

## **PRELIMINARY STATEMENT**

This case exemplifies forum shopping at its most cynical. From inception, Labaton Keller Sucharow, LLP's mass arbitration strategy has been to threaten Epson with tens of millions of dollars in JAMS filing fees to leverage a settlement, not to pursue their baseless consumer claims. Labaton enrolled thousands of "clients" via an online form it touts takes just "two minutes" and filed thousands of identical arbitration demands on their behalf. (The crux of these claims is that, following software or firmware updates, the Epson printers at issue may disable unsupported third-party ink cartridges, *i.e.*, they perform in exactly the manner Epson describes to users both before purchase and at all relevant times during use.)

Had Labaton sought swift adjudication of these substantive claims, it would have agreed more than two years ago to arbitration in FedArb, the forum elected in the current version of Epson's end user software license agreement (EULA), which most (if not all) of Labaton's clients accepted (if they purchased Epson printers at all). Labaton does not contend FedArb is unfair, but FedArb's fee structure takes away Labaton's only cudgel: the $2,000 in JAMS filing fees per individual arbitration for its thousands of claimants.

Epson responded to Labaton's strongarm tactics by filing two declaratory relief actions in state court (one for apparent parties to an Epson EULA, and one for individuals who did not appear to have any business relationship with Epson at all). Since March 2023, the parties have been litigating before Orange County Superior Court Judge Hurwitz two threshold issues reserved for decision by a court: (i) whether Labaton's thousands of claimants—all of whom failed to provide even basic facts regarding their claims, such as the printer model they purchased—complied with good faith pre-suit dispute resolution requirements of all Epson EULAs; and (ii) which, if any, EULA (and, thus, arbitration provision) applies to each claimant. Indeed, the parties litigated these cases all the way through a trial on the briefs.

Disenchanted with Judge Hurwitz's rulings, and despite the resources the state

court already expended on these issues, Labaton engineered a last-minute forum change seeking a more favorable audience: It found another 1,268 would-be claimants to file this action in federal court and, when Epson substituted the *Aaron* petitioners for Doe defendants in one of the state court actions, Labaton removed that case to this Court too (the cases are now consolidated).

Of course, that Labaton's "mass arbitration" model amounts to process-based extortion or that its substantive claims are facially meritless or that it scrapped several months of state court litigation because it did not care for the results do not dispose of its petition to compel. But this backdrop explains why Labaton all but ignores every obstacle to its JAMS-dependent strategy, such as the very existence of Epson's current EULA (which provides for arbitration of Labaton's clients' claims in FedArb); the black-letter Supreme Court precedent reserving to the courts the question of which EULA applies; and whether Labaton's clients complied with the pre-dispute notice requirements in both EULAs. Just as the Orange County Superior Court was in the process of doing when these issues were removed from its docket, this Court must determine these threshold issues—and should allow related discovery—before sending any of petitioners' claims to arbitration.

The Court should also deny petitioners' requests for a stay and sanctions. The FAA stay provision petitioners invoke does not apply: as explained throughout this opposition, the questions the parties raise here are reserved to the courts. No sanctions are warranted because the California Code of Civil Procedure section petitioners cite does not apply to arbitrations governed by the FAA (like these).

## FACTUAL AND PROCEDURAL BACKGROUND

**Epson Prominently Discloses That Third-Party Ink Cartridges Are Not Supported by the Relevant Printers.** Epson America, Inc. is the U.S. sales and distribution arm for products designed and manufactured by Seiko Epson Corporation. Declaration of Megha Shukla ¶ 3. Epson offers two basic types of consumer printers: cartridge-based printers and EcoTank printers. Epson's cartridge

printers provide consumers with access to great features and performance at a low up-front hardware cost in exchange for a higher running cost; for a lower running cost, EcoTank printers have large capacity ink tanks that can be refilled with low-cost ink bottles. Shukla Decl. ¶ 4. Most of Epson's cartridge printers currently in use are designed to use only genuine Epson-branded cartridges and some employ firmware to support that design. *Id.*

Importantly, third-party ink cartridges may not function compatibly or continuously with Epson printers and may even cause damage to the printer hardware. Shukla Decl. ¶ 5. To prevent users from associating inferior prints or adverse outcomes caused by third-party ink cartridges with Epson's printer technology, Epson advises consumers that Epson printers do not support third-party ink cartridges. *Id.* ¶ 6. Indeed, Epson prominently discloses *on the printer packaging* that the printers are designed to be used with genuine Epson cartridges only, and users are repeatedly reminded that third-party ink cartridges may not function properly or at all following firmware or software updates, *id.*, which is precisely the underlying substantive complaint Labaton alleges. *See, e.g.*, ECF No. 28 ¶ 8 ("Petitioners' federal and state claims against Epson arise out of Epson's practice of 'updating' the firmware and software in Petitioners' Epson printers to prevent those printers from using inexpensive, non-Epson ink cartridges.").

For example, at all relevant times, the packaging for the Epson Expression XP-440 printer has read "[p]rinter is designed for use with Epson cartridges only, not third-party cartridges or ink," placed prominently on the dual fronts of the packaging. Shukla Decl. Ex. A. This same disclosure was also included on the "Start Here" poster, a convenient guide most customers use when setting up a new Epson printer. *Id.* Ex. B. The User's Guide and Product Specifications available online contain similar disclosures that the printer is "[d]esigned for use with Epson cartridges only" and "[t]his product uses only genuine Epson-brand cartridges." *Id.* Exs. C&D. Additionally, *during the firmware update process itself*, the disclosure "[f]or printers

designed to use Epson genuine cartridges only: Non-Epson branded or altered Epson cartridges that functioned prior to a firmware update may not continue to function" is displayed on the "Instruction and Precautions for Update" screen. *Id.* Ex. E. This information has appeared immediately above the button the consumer must "click" to download the firmware at all relevant times. *Id.* ¶ 11. Thus, the bottom line of Labaton's substantive claims against Epson is that certain of its cartridge-based printers operated exactly as Epson clearly, prominently, and repeatedly disclosed they would.

**Epson Updates Its EULA (Which Is Accepted During Updates) in April 2022 and Rolls It Out by September 2022.** When first setting up an Epson printer, users must agree to Epson's "End User Software License Agreement," or EULA, by "clicking" their assent to the terms. Shukla Decl. ¶ 12. Users also agree to the then-operative EULA when they download periodic firmware and software updates. *Id.* ¶ 13. Although Epson recommends consumers keep their printers updated with the latest software and firmware, the updates are entirely voluntary. *Id.* Once a user initiates the update, the user is automatically presented with the then-operative version of Epson's EULA, which they are encouraged to review carefully; the user is given the option to select "Agree" or "Disagree" to the EULA terms and must then click the "OK" button to continue. *Id.* ¶ 14.

Epson has updated its EULA over time. Shukla Decl. ¶ 15. Relevant here, Epson finalized the now-current EULA in April 2022 (months prior to Labaton's first notice letters to Epson) and began the process of rolling this EULA out to customers in connection with firmware updates. *Id.* The release dates of firmware vary by printer model and are done periodically on no set schedule. *Id.* ¶ 16. Since Epson finalized the current EULA in April 2022, there have been multiple updates for each printer model relevant to this dispute that would have contained this version of the EULA and required affirmative acceptance of its terms to download the update. *Id.* Any firmware or software update occurring after September 2022 would have been

accompanied by the now-current EULA. *Id.* When accepted by the user, the current EULA replaces the prior EULA in its entirety. Shukla Decl. Ex. F at § 11 (operative EULA "is the entire agreement between the parties related to the Software and supersedes any purchase order, communication, advertisement, or representation concerning the software").

Because updates (and acceptance of EULA terms) occur upon user agreement, the date on which the now-current EULA became operative will vary as to every consumer. Shukla Decl. ¶ 17. Epson has never employed any mechanism to track when or if individual users download any firmware update or accept any EULA. *Id.* Nor can Epson track this data at the level of individual printer units (such as by serial number). *Id.* Thus, Epson does not have records of the date on which any user initiated such a firmware update and agreed to the now-current EULA. *Id.*

**Both EULAs Require Good Faith, Pre-Filing Dispute Resolution Efforts.**

The current EULA, like the previous one (invoked by petitioners), requires a claimant (whether the user or Epson), "[b]efore submitting a claim for arbitration, . . . to try, for sixty (60) days, to resolve any Dispute informally." Shukla Decl. Ex. F at § 22.2; *accord id.* Ex. G at § 14.3. The claimant must provide a notice of dispute, which "shall include the sender's name, address and contact information, *the facts giving rise to the Dispute*, and the relief requested . . . ." *Id.* Ex. F at § 22.2 (emphasis added); *accord id.* Ex. G at § 14.3. Similarly, both EULAs require the parties "to act in good faith to resolve the Dispute *before commencing arbitration*." *Id.* Ex. F at § 22.2 (emphasis added); *accord* Ex. G at § 14.3. The operative EULA also specifies that "[t]o minimize the cost and inconvenience to all parties, and to promote prompt resolution of Disputes," the parties "agree that engaging in this initial dispute resolution process is a material term of this Agreement and a requirement that must be fulfilled *before commencing any arbitration*." *Id.* Ex. F at § 22.2 (emphasis added).

The current EULA also expressly provides that "any disagreements regarding compliance with this Section 22.2 [regarding pre-filing dispute resolution

requirements] *shall be decided by a court, not an arbitrator*." Shukla Decl. Ex. F at § 22.2 (emphasis added). Moreover, "pending resolution of any such disagreements by a court, which may include requests to compel compliance with this Section 22.2," any "arbitration (as well as any obligation to pay arbitration fees) shall be stayed until the initial dispute resolution process in Section 22.2 [of the current EULA] is complete." *Id.* The current EULA further provides that any failure to comply with the initial dispute resolution process under the current EULA constitutes irreparable harm and that "a court may issue an order staying arbitration (and any obligation to pay arbitration fees)" until those processes are complete. *Id.*

### **The Current EULA Directs Mass Arbitrations to FedArb, Minimizing the Threat of Massive Administration Fees While Protecting Individual Consumers.**

The current EULA included amendments to address potentially abusive "mass arbitrations," by which plaintiffs' attorneys use the threat of thousands of identical, often dubious, arbitration demands to leverage settlements based on a company facing millions in filing fees. The current EULA thus provides that, although binding arbitration shall generally be administered by JAMS, "if 20 or more demands for arbitration are filed relating to the same or similar subject matter and sharing common issues of law or fact, *and* counsel for the parties submitting the demands are the same or coordinated, . . . this will constitute a 'Mass Arbitration.'" Shukla Decl. Ex. F at § 22.6(h). All such mass arbitrations "shall be administered by FedArb, a nationally recognized arbitration provider, and governed by the FedArb Rules in effect . . . and . . . using FedArb's Framework for Mass Arbitration Proceedings ADR-MDL." *Id.*

FedArb provides a variety of innovations to facilitate fair and efficient resolution of such claims. Morgan Decl. Ex. 1. It also employs a fee structure that mitigates some of the hold-up dangers imposed by existing JAMS arbitration fee schedules in the mass arbitration context. *Id.*

The operative EULA provides that "if either party fails or refuses to commence [a] Mass Arbitration before FedArb," the other party may seek an order from a court

of competent jurisdiction compelling compliance with this Section 22.6(h) and compelling administration of the Mass Arbitration before FedArb" and "all arbitrations comprising the Mass Arbitration (and any obligation to pay arbitration fees) shall be stayed." Shukla Decl. Ex. F at § 22.6(h). As with the pre-dispute resolution procedures, the operative EULA provides that a party's failure to comply with the mass arbitration rules "would irreparably harm the other," and "a court may issue an order staying the arbitrations (and any obligation pay arbitration fees)" until any disagreements over compliance "are resolved by the court." *Id.*

**Labaton Files Thousands of Unvetted, Meritless Arbitration Claims.** In March 2020, Labaton launched a new "Mass ADR" practice group, which Labaton has described as a "highly fruitful area for the firm." Morgan Decl. Ex 2. As of September 2022, Labaton boasted more than 250,000 mass arbitration "clients." Rather than personally engage with these clients, Labaton's mass arbitration group "advertises on social media and search engines" and built a database of past clients it mines to file new cases. *Id.* Exs. 2&3.

For its campaign against Epson, for example, Labaton indiscriminately solicited more than ten thousand potential arbitration claimants through a webpage that allowed individuals to "[s]ign up to recover money [they] spent on Epson ink, or up to 3x that amount if [they] live in certain states" in a mere "2 [m]inutes," by answering a survey that asked them *only* whether they own an Epson XP or WF series printer (yes or no) and to provide their contact information. *See, e.g.*, *Arnoff v. Epson America, Inc.*, No. 8:24-cv-01996-FWS-DFM (C.D. Cal.) ("*Arnoff*"), ECF No. 1-13 at 248-254 (stipulated Ex. 57); *id.*, ECF No. 1-10 at 11, 15; *id.*, ECF No. 1-9 at 9, 15 ¶ 36 (stipulated fact). As explained below, many of these enrollments proved incomplete, erroneous, or outright fraudulent with only the slightest investigation.

On August 31, 2022, a Labaton attorney sent Epson a purported "Notice of Claims of 6,570 Individuals Against Epson America, Inc." *Arnoff*, ECF No. 1-11 at 29-76 & ECF No. 1-12 at 2-73 (stipulated Exs. 3-4); *id.*, ECF No. 1-10 at 11, 12; *id.*,

ECF No. 9 at 9, 11 ¶¶ 3-5 (stipulated facts). Labaton claimed these 6,570 people "purchased Epson printers and wish to use less expensive third-party ink," but complained of Epson's alleged "pattern or practice of using unauthorized software and firmware updates to disable [their] printers when non-Epson, replacement ink cartridges are installed." *Id.*, ECF No. 1-11 at 30.[1] Absent reaching a "satisfactory resolution" within 60 days, Labaton threatened these 6,570 clients would "begin filing arbitrations" with JAMS. *Id.* at 30, 37.

The only information Labaton provided regarding each of its 6,570 clients was the client's name, phone number, and email address. *Arnoff*, ECF No. 1-11 at 38-76 & ECF No. 1-12 at 2-73 (stipulated Ex. 4); *id.*, ECF No. 9 at 9, 11 ¶ 5 (stipulated fact). It did not provide, for example, any information regarding whether or when each claimant bought a *relevant* Epson printer; proof of purchase; serial numbers; whether the claimant bought and tried to use any third-party ink cartridges; or even any basic information regarding any downloaded firmware or software updates that caused third-party ink cartridges not to function. *Id.*, ECF No. 1-11 at 38-76 & ECF No. 1-12 at 2-73 (stipulated Ex. 4).

Epson responded by noting that the minimal information Labaton provided was insufficient to make even threshold assessments of the validity of its clients' claims. Epson requested information to further the informal dispute resolution process, including, for each claimant, the printer model purchased, date of purchase, printer serial number, proof of purchase, date and brands of any third-party ink cartridge purchases, and dates of firmware/software downloads. *Id.*, ECF No. 1-12 at 115-119 (stipulated Ex. 9); *id.*, ECF No. 1-10 at 11, 12.

Labaton did not provide that information. Instead, Labaton sent a second purported "Notice of Claims" for an additional 6,802 "clients," making the same

---

[1]  Epson is aware of no evidence any Epson printers themselves—as opposed to third-party ink cartridges Epson explicitly cautions may cease functioning—actually stop working following updates.

substantive allegations levied in its original letter, and again threatening that these clients would "begin filing arbitrations" with JAMS absent a "satisfactory resolution." *Arnoff*, ECF No. 1-12 at 132-270 (stipulated Exs. 13-14); *id.*, ECF No. 1-10 at 11, 12; *id.*, ECF No. 9 at 9, 12 ¶¶ 9-11 (stipulated facts). Epson reiterated the inadequacy of the information Labaton provided. *Id.*, ECF No. 1-13 at 11-13 (stipulated Ex. 16); *id.*, ECF No. 1-10 at 11, 13. Epson continued to communicate with Labaton regarding these deficiencies and, despite them, participated in a mediation on February 15, 2023. *Id.*, ECF No. 1-9 at 9, 13-14 ¶ 27 (stipulated fact). Still, as of March 6, 2023 (when Labaton began filing thousands of individual arbitration claims in JAMS):

- ***None*** of the claimants provided proof of purchasing an Epson printer;
- ***None*** provided ***any*** information concerning the firmware update purportedly downloaded, nor its alleged impact on any third-party ink;
- ***None*** provided ***any*** information concerning damages purportedly incurred as a result of their alleged inability to use third-party ink;
- More than 84% failed to provide even a serial number or any evidence to suggest they ***even owned of an Epson printer*** (as opposed to being an online fraudster attracted by Labaton's promise it would take just "2 minutes" to "recover money").

These facts are undisputed. *Arnoff*, ECF No. 1-9 at 9, 14 ¶ 32; *id.*, ECF No. 1-12 at 74-106, 271-301, ECF No. 1-13 at 2-10, 68-70, 141-153 (stipulated Exs. 5, 15, 34, and 53).

**After Labaton Files Thousands of Arbitrations in JAMS, Epson Seeks Declaratory Relief in State Court.** On March 6, 2023, despite its failure to provide the basic information Epson had requested, Labaton filed 3,994 individual arbitrations in JAMS, which alone threatened to require Epson to post nearly $8,000,000 in JAMS filing fees. *Arnoff*, ECF No. 1-9 at 9, 14 ¶ 30 (stipulated fact); Morgan Decl. Ex. 4. In response, Epson filed two actions in Orange County Superior Court: *Epson America,*

*Inc. v. Arnoff*, against 1,833 Labaton clients for which Labaton had provided some basis to suggest they were subject to an arbitration agreement with Epson, and *Epson America, Inc. v. Adams*, against 2,166 Labaton clients for which Labaton had not provided, and Epson did not itself have, any evidence suggesting the client had an arbitration agreement (or, indeed, any relationship) with Epson at all. *See, e.g.*, *Arnoff*, ECF No. 1-1; Morgan Decl. Ex. 5.

As Epson noted in its complaints, "Epson ha[d] no interest in suing its customers and file[d] [*Arnoff* and *Adams*] only as a last resort because, despite Epson's repeated efforts to convince their counsel to observe the basic requirements of their clients' binding arbitration agreements, [Labaton] persisted in filing individual arbitrations on behalf of [the *Arnoff* and *Adams* defendants and thousands of other individuals Labaton had identified as prospective claimants, whom Epson sued as John Doe defendants] in the wrong arbitral forum." *Arnoff*, ECF No. 1-1 ¶ 2 & n.1; Morgan Decl. Ex. 5 ¶ 4.

*Arnoff* and *Adams* sought to resolve disputes relating to Labaton's attempt to file thousands of individual claims in JAMS, specifically: (i) whether the prior EULA or the operative EULA applies to each Labaton client's claims; (ii) regardless of which EULA applies, whether the Labaton clients satisfied the pre-filing dispute resolution requirements; and (iii) as to numerous Labaton clients, whether they were subject to any arbitration agreement at all. Having filed these declaratory relief actions, Epson did not pay JAMS the arbitration filing fees it had invoiced, the arbitrations were administratively closed, and Labaton withdrew its clients' claims without prejudice. Morgan Decl. ¶ 7.

**The Parties Litigate Issues Reserved to the Court *Through Trial.*** *Arnoff* and *Adams* were assigned to Orange County Superior Court Judge Hon. Lon H. Hurwitz. Finding that both EULAs included "virtually identical" pre-filing dispute resolution requirements, Judge Hurwitz bifurcated trial of *Adams* and *Arnoff* to "first try the issues of (1) what was necessary to satisfy this requirement for an attempt at informal

resolution and (2) whether such provision of each EULA was in fact satisfied." *Arnoff*, ECF No. 1-15 at 94, 100-101; *id.*, ECF No. 1-6 at 19. Judge Hurwitz set a one-day bench trial for January 29, 2024. *Id.*, ECF No. 1-8 at 308. Shortly before trial, the parties reached stipulations regarding undisputed facts and exhibits and by agreement of the parties, Judge Hurwitz vacated the bench trial on January 24, 2024 in favor of a decision based on written submissions. *Id.*, ECF No. 1-9 at 2-3.

Judge Hurwitz issued an initial "Analyses and Order" on July 10, 2024, *id.*, ECF No. 1-15 at 94-139, which instructed Labaton's claimants to "provide information ***to this Court*** as to when the product(s) giving rise to their claim were purchased, what the/those products were, and serial numbers of the products," and ordered Labaton to provide a chart of this information for all the *Arnoff* and *Adams* defendants. *Id.* at 137-39 (emphases original).[2]

**Court-Ordered Disclosures Confirm Labaton's "Clients" Include Large Numbers of Claimants Lacking Information and Apparent Frauds.** On September 6, 2024, Labaton submitted declarations and spreadsheets with claimant information in the *Arnoff* and *Adams* actions, which it amended five days later. ECF No. 1-18 at 132-183; Morgan Decl. Ex. 6. These submissions laid bare numerous problems with Labaton's thousands of would be-arbitration claims, including missing critical information and some apparent frauds.

For example, of 1,833 claimants listed in Labaton's submission in *Arnoff*: 412 claimants failed to provide a model number for their Epson printer and 655 claimants failed to provide a serial number. Morgan Decl. ¶ 9. Of those who did purport to provide serial numbers, 213 were invalid and do not match any Epson product for the U.S. market. *Id.* ¶ 10. Moreover, of those *Arnoff* claimants who did

---

[2]   Epson contests some of Judge Hurwitz's legal conclusions in his July 10, 2024 "Analyses and Order"—specifically those relating to the effect of the operative EULA on the prior one. Rather than shop for a new forum like Labaton, however, Epson filed a brief response addressing the issue. *See* ECF No. 1-16 at 15-19.

purport to provide a model number, **at least 30** of those claimant's printers correspond to EcoTank models (as the model number prefix "ET" suggests and a Google search confirms, or as is evident from the use of "EcoTank" in some of the model number fields) that use refillable ink tanks instead of ink cartridges, and therefore are not relevant to this case. *See, e.g.*, ECF No. 1-18 at 159-183.

Further, although Epson's review of Labaton's submissions is ongoing, several claims appear to be fraudulent. For example:

- One *Arnoff* claimant purports to own an Epson Workforce WF-3720 bearing serial number X2TH001227. This serial number is featured in a photo that (as of this writing) was the sixth image result for the search "Epson printer serial number" on Microsoft Bing. Notably, this printer appears to have been imported for sale in Europe, not the United States.[3]

- Another *Arnoff* claimant claims to own an Epson Workforce WF-3730 bearing serial number X5CL011774. This serial number appears in photos of a printer sold in Canada in a blog post regarding how to identify a printer model number available at 4inkjets.com.[4]

- One *Adams* claimant identified an Epson Workforce ES-580W Wireless Duplex Touchscreen Desktop Document Scanner bearing serial number X7RV000874. This serial number is displayed in

---

[3]  *Compare Arnoff*, ECF No. 1-18 at 162 (Maurice Andrews) *with* Morgan Decl. Ex. 7. In the sworn attestation he submitted in this case, Mr. Andrews provided a different serial number. ECF No. 28-13 at 86-89. This serial number does not appear to be valid because it does not include any letters.

[4]  *Compare Arnoff*, ECF No. 1-18 at 177 (Richard Polich) *with* Morgan Decl. Exs. 8&9.

1     photos in a February 23, 2021 blog post by a different individual

2     reviewing her new printer.[5]

3   These examples are merely illustrative.

4       **Labaton Sues on Behalf of Another 1,268 "Clients" in This Court and**

5  **Removes _Arnoff._** Apparently dissatisfied with the proceedings in Judge Hurwitz's

6  court, on August 6, 2024, Labaton filed _Aaron v. Epson America, Inc._ in this Court

7  on behalf of an additional 1,268 "clients" it contends wish to pursue individual

8  arbitrations against Epson in JAMS (at a cost of an additional $2.5 million-plus to

9  Epson in JAMS filing fees if successful). ECF No. 1; Morgan Decl. Ex. 4. Labaton

10  submitted attestations with the _Aaron_ petition in which petitioners were asked to

11  check a box that they "have not affirmatively assented to any updates to [their] Epson

12  Printer Software License Agreement since September 1, 2022," if applicable. ECF

13  Nos. 1-3 – 1-12. At least 406 petitioners did not check this box and, thus apparently

14  could _not_ testify that they did not accept Epson's EULA after September 1, 2022 (_i.e._,

15  after the current EULA was rolled out). Morgan Decl. Ex. 11.

16      The original 1,268 _Aaron_ petitioners had not previously initiated arbitrations;

17  accordingly, Epson amended its complaint in the _Arnoff_ action in state court to

18  substitute the _Aaron_ petitioners for Doe defendants. Labaton then removed the _Arnoff_

19  action to this Court. _See, e.g._, _Arnoff_, ECF No. 1 ¶¶ 11-15.

20      The Court consolidated the cases, and Labaton filed a consolidated petition to

21  compel arbitration. ECF No. 28. Labaton appended form attestations for 764 of the

22  recently-consolidated _Arnoff_ defendants. ECF Nos. 28-3 – 28-22. At least 233 of

23  these claimants could not testify that they did not accept Epson's EULA after

24  September 1, 2022 (_i.e._, after the current EULA was completely rolled out). Morgan

25  Decl. Ex. 12.

26

27

28   [5]  _Compare_ Morgan Decl. Ex. 6 at Attachment 1 (Reda Nanil) _with id._ Ex. 10.

# **ARGUMENT**

## I. **BEFORE COMPELLING ARBITRATION, THIS COURT MUST DECIDE THRESHOLD ISSUES CONCERNING WHICH EULA APPLIES AND WHETHER PETITIONERS COMPLIED WITH PRE-FILING DISPUTE REQUIREMENTS**

"[C]ourts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010).

In this case, there is a threshold dispute between the parties regarding which EULA applies to petitioners' claims: petitioners contend Epson's prior EULA applies, and Epson contends the current EULA applies. Because the prior EULA delegates questions of arbitrability to a JAMS arbitrator, but the current EULA reserves important threshold questions of arbitrability for the courts alone to decide, under clear Supreme Court precedent, the Court must decide which EULA applies to petitioners' claims.

In *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024), the Supreme Court recently confirmed that a court—not an arbitrator—must resolve any dispute between parties regarding which of two or more competing arbitration agreements applies. *Id.* at 145, 152. In *Coinbase*, the parties executed one arbitration agreement with a broad delegation provision that assigned all disputes about arbitrability to the arbitrator, but a subsequent agreement regarding the rules of a sweepstakes included a forum selection clause sending all disputes to California state or federal court. *Id.* at 146. Coinbase contended the delegation clause of the first agreement controlled; the respondents contended the forum selection clause superseded that agreement. *Id.* at 149. The Court noted that "[i]f Coinbase is right that the . . . delegation clause was meant to govern all agreements moving forward, then the parties agreed to arbitrate all subsequent arbitrability," but "[i]f respondents are correct that the Official Rules'

forum selection clause superseded the . . . delegation clause, then the parties meant to send sweepstakes disputes—including those over arbitrability—to California courts." *Id.* at 149-50. Accordingly, "the question whether these parties agreed to arbitrate arbitrability can be answered only by determining which contract applies." *Id.* at 150. The Supreme Court concluded: "When we home in on the conflict between the delegation clause in the first contract and forum selection clause in the second, the question is whether the parties agreed to send the given dispute to arbitration—and, per usual, *that* question must be answered by a court." *Id.* Accordingly, this Court—not JAMS—must first determine which EULA applies to each petitioner's claims.

This Court must also determine whether petitioners complied with the pre-filing dispute resolution requirements imposed by *both* EULAs. As an initial matter, Epson's current EULA explicitly and exclusively reserves to the Court "any disagreements regarding compliance with Section 22.2 [stating initial dispute resolution requirements]." Shukla Decl. Ex. F. But even to the extent the Court concludes (after limited discovery) that the prior EULA applies to any petitioners,[6] the Court should still reach the question of whether those petitioners (who provided no different information or notice before filing their claims than petitioners who are subject to the current EULA) complied with the EULAs' pre-filing dispute resolution

---

[6] On November 12, 2024, Judge Hurwitz issued his Proposed Statement of Decision concerning the trial (on the papers) in *Adams*. Morgan Decl. Ex. 14. As to 1,478 of the 2,166 claimants who provided only their names, the Court determined there was insufficient evidence to find they were subject to the old EULA (or any EULA), such that they cannot pursue claims in arbitration. *Id.* at 34-35. As to another 683 claimants who provided at least a model number and purchase date, Judge Hurwitz concluded the prior EULA applies to these remaining claimants and that, under the prior EULA, the question of whether those claimants satisfied the dispute resolution requirements is delegated to an arbitrator. *Id.* at 33-34. Epson intends to file objections to these latter aspects of the proposed decision on numerous grounds, including that the stipulated scope of the trial *did not include* the question of which EULA applies to each claimant, and accordingly Epson did not present evidence on this issue prior to the court's ruling.

requirements. Both EULAs are clear the parties' efforts to resolve disputes informally must occur "*before* submitting a claim for arbitration." *Arnoff*, ECF No. 1-9 at 10-11 ¶ 2 (stipulated fact). Thus, JAMS plainly does not have jurisdiction over an issue that, by the very terms of the agreement, must take place *before* anything is ever submitted to JAMS. A contrary interpretation would improperly read out of the agreement its unambiguous requirements with respect to the sequencing of events. *See, e.g.*, *Rice v. Downs*, 248 Cal. App. 4th 175, 185 (2016) ("The Court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language") (citations, quotations omitted). Indeed, the current EULA confirms this sequence by explicitly providing that "any disagreements regarding compliance . . . shall be decided by a court, not an arbitrator" in recognition that no arbitration can be commenced until this requirement is satisfied. Shukla Decl. Ex. F at § 22.2. Thus, the more fact-intensive question of which agreement (if any) applies need not be resolved before addressing this gateway issue.

## II. THE EVIDENCE ADDUCED TO DATE CONFIRMS AT LEAST 639 PETITIONERS HAVE NO RIGHT TO ARBITRATION IN JAMS

Here, petitioners—as the parties seeking to compel arbitration—bear the burden to prove "(1) the existence of a [still] valid, written agreement to arbitrate; and, if it exists, (2) that the agreement to arbitrate encompasses the dispute at issue." *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015); *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021).

District courts ruling on a motion to compel arbitration "appl[y] a standard similar to the summary judgment standard of [Federal Rule of Civil Procedure] 56." *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (citation, quotations omitted). "Only when there is no genuine issue of material fact concerning the formation of an arbitration agreement should a court decide as a matter of law that the parties did or did not enter into such an agreement." *Id.* (citing *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)).

As explained in the Shukla Declaration, Epson finalized the current Epson EULA in April 2022; any user who received and downloaded a software or firmware update after that date would have accepted the terms of the current Epson EULA. *Id.* ¶ 16. The 639 petitioners identified in Exhibit 13 to the Morgan Declaration— including 406 of the original *Aaron* petitioners and 233 of the later-consolidated *Arnoff* petitioners—confirmed under oath in their attestations (submitted within ECF Nos. 28-3 – 28-22) that they *have* "affirmatively assented to [] updates to [their] Epson Printer Software License Agreement since September 1, 2022." Thus, by their own admission, these 639 petitioners have accepted Epson's current EULA and no basis exists to compel arbitration in JAMS for these petitioners. Additionally, 807 *Arnoff* petitioners identified in Exhibit 12 failed to provide a serial number for an affected Epson printer at all or, worse, provided a phony serial number. As to these petitioners, there is no basis to conclude they have any arbitration agreement with Epson at all that could serve as a basis to compel arbitration in JAMS (or anywhere else).

## III. DISCOVERY IS REQUIRED AS TO AT LEAST ALL REMAINING 2,452 PETITIONERS

Under Section 4 of the FAA, in response to a motion to compel arbitration, "[t]he court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. On the other hand, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." *Id.* As part of the FAA's provision that a district court "shall hear the parties," courts regularly permit limited discovery relating to threshold issues of arbitrability such as contract formation and violation. *See, e.g.*, *Beltran v. PeopleReady, Inc.*, No. 3:23-CV-00179-WHO, 2023 WL 3092973, at *8-9 (N.D. Cal. Apr. 25, 2023); *Pierre v. IEC Corp.*, No. 8:22-CV-01280-FWS-JDE, 2023 WL 3551962, at *5 (C.D. Cal. Mar. 14, 2023) (Slaughter, J.).

*Beltran* is instructive. There, the non-movant disputed whether he agreed to the arbitration provision at issue. The court found that "on th[e] limited record" it could not determine there was a "*genuine* dispute" of fact "given the obvious holes in each party's evidence," 2023 WL 3092973, at \*8 (emphasis original), and thus permitted the parties to "conduct limited discovery related to the alleged contract formation and violation," and supplemental briefing. "At the hearing, if there are no genuine disputes of material fact," the court "will rule on the motion to compel arbitration" but "[i]f genuine disputes remain that cannot be resolved by a further evidentiary hearing, the question [would] go to a jury." *Id*.

Here, limited discovery is appropriate to fill the "obvious holes" in the factual record on whether petitioners accepted the current EULA. As shown above and in the Shukla Declaration, Epson does not track consumer downloads updates and related acceptances of updated EULA terms. *See* Shukla Decl. ¶ 17. Accordingly, the only record evidence regarding this issue to date is the petitioners' recently-produced form attestations which—as explained above—are in many instances suspect on their face (with, for example, declarants reporting ownership of printers that do not use cartridges, and claimants reporting serial numbers they appear to have found in readily-locatable photos of Epson printers on the Internet). Epson is entitled to test the veracity of these form declarations through limited additional discovery. For example, discovery requests for photographs of each claimant's printer's screen identifying the current version of printer firmware and of serial numbers could (i) confirm whether each claimant has downloaded a firmware update after the current EULA was rolled out; and (ii) provide additional evidence that claimants actually have a relevant printer. In the absence of such discovery, conclusory, self-serving testimony proffered by clicking a button should not be credited at all. *E.g.*, *Lorber Indus. of California v. Los Angeles Printworks Corp*., 803 F.2d 523, 525 (9th Cir.

1986); *Powell v. UHG I LLC*, No. 23-CV-0086 DMS (KSC), 2023 WL 9503474, *2 (S.D. Cal. Dec. 29, 2023).[7]

Discovery is also important because counsel has "verified" under oath obviously false statements. *Compare, e.g.*, ECF No. 28 ¶¶ 6, 8 ("Petitioners are customers of Epson whose printers were harmed by firmware and software 'updates' intended to prevent them from using non-Epson ink and who attempted to use non-Epson ink. . . . Petitioners' federal and state claims against Epson arise out of Epson's practice of 'updating' the firmware and software in Petitioners' Epson printers to prevent those printers from using inexpensive, non-Epson ink cartridges. . . .") & *id.* at 22 (Mr. Waisnor's verification under penalty of perjury) *with* Morgan Decl. Ex. 12 (showing that, according to petitioners' own submissions, numerous petitioners own cartridge-less EcoTank printers that do not experience the alleged disabling of third party ink cartridges during firmware updates). Because petitioners' "verified" petition cannot be accepted at face value, limited discovery is all the more warranted here.

## IV.    THE COURT SHOULD DENY PETITIONERS' STAY REQUEST

Petitioners' request for a stay should be denied because it erroneously presumes petitioners have established that the Court must compel arbitration in JAMS. As explained throughout this opposition, the questions presented in these proceedings are threshold inquiries reserved to this Court under the Supreme Court's decision in *Coinbase* and the EULAs which must be resolved prior to compelling arbitration in any forum. Neither Epson nor petitioners are seeking to litigate the merits of

---

[7] Epson reserves arguments that petitioners are misjoined. *See, e.g.*, *In Re Kia Hyundai Vehicle Theft Litig.*, No. 8:22-ML-03052-JVS (KESX), 2024 WL 4415204, at *3 (C.D. Cal. July 2, 2024) ("Rule 20's 'single transaction or occurrence requirement [for joinder] is not met where plaintiffs would have to prove their claims . . . on an individualized basis.'") (citations omitted). Whether and when each individual claimant agreed to Epson's current EULA is a separate factual inquiry because it depends on when the claimant downloaded an update requiring acceptance of the current EULA.

petitioners' claims until these threshold disputes are resolved. Accordingly, the proceedings occurring in this Court are the very ones the Court must hold prior to deciding whether petitioners have a right to arbitrate in any forum, such that no stay is warranted. *See* 9 U.S.C. § 3 (addressing stays "upon [the Court] being satisfied that the issue involved . . . is referable to arbitration under such an agreement").

## V.    THE COURT SHOULD DENY PETITIONERS' REQUEST FOR SANCTIONS

Finally, the Court should summarily reject the *Arnoff* subset of petitioners' request for costs and fees as a sanction for Epson's non-payment of filing fees in JAMS while it pursued declaratory relief against Labaton's strongarm arbitration tactics. As an initial matter, as explained above, petitioners have failed to establish that the prior EULA—which is the only one under which the *Arnoff* petitioners can or do complain Epson failed to pay JAMS fees—apply to their claims, which alone defeats their request for sanctions.

However, even assuming that the prior EULA applies to any of the *Arnoff* petitioners' claims, petitioners' request for sanctions fails under well-established law and the undisputed facts. Specifically, the California Arbitration Act, including Section 1281.97 of the Code of Civil Procedure—which petitioners invoke here as the basis for sanctions—does not apply to arbitration agreements governed by the FAA like Section 14 of the prior EULA. *See, e.g.*, *Hernandez v. Sohnen Enters., Inc.*, 102 Cal. App. 5th 222, 241-42 (2024) (arbitration agreement stating "this agreement is governed by the FAA" encompasses both procedural and substantive provisions of the FAA and "procedures of the CAA, including section 1281.97, do not apply"); *see also Victrola 89, LLC v. Jaman Properties 8 LLC*, 46 Cal. App. 5th 337, 350 (2020) (although invoking CAA for discovery and application of California law, arbitration agreement stating "[e]nforcement of this agreement to arbitrate shall be governed by the [FAA]" meant FAA—not CAA—applied to all issues of enforcement); *accord Davis v. Shiekh Shoes, LLC*, 84 Cal. App. 5th 956, 963 (2022) (similar). Moreover,

courts have repeatedly held that, even if it had any application, the FAA preempts application of Section 1281.97. *See, e.g.*, *Russell v. Siemens Indus. Software Inc.*, No. 23-CV-03884-LJC, 2024 WL 4545970, at *8-11 (N.D. Cal. Oct. 21, 2024) (summarizing case law).

It is undisputed the prior EULA (on which Labaton relies, and the only EULA relevant to petitioners' request for sanctions) expressly adopts the FAA to govern any arbitration between the parties. Section 14.2 of the prior EULA states in relevant part: "You and Epson understand and agree that (a) the Federal Arbitration Act (9 U.S.C. § 1, et seq.) governs the interpretation and enforcement of this Section 14, [and] (b) this Agreement memorializes a transaction in interstate commerce[.]" ECF No. 28-2. The prior EULA does not include any choice-of-law provision electing California law, nor does it mention the California Arbitration Act at all. *See id.* Moreover, petitioners repeatedly concede the FAA applies here. ECF No. 28 at ¶ 1, 48, 53, 69 (citing FAA). Petitioners' frivolous request for sanctions should be denied.

## CONCLUSION

The Court should deny the petition to compel; decide whether petitioners have complied with the EULAs' pre-arbitration requirements; permit limited discovery regarding which EULA applies to petitioners' claims; conduct a summary trial on these threshold issues; and deny petitioners' request for a stay and sanctions.

DATED:  November 18, 2024          QUINN EMANUEL URQUHART & SULLIVAN, LLP


By ___/s/ Shon Morgan_____

Shon Morgan
*Attorneys for Respondent*
*Epson America, Inc.*

Case No. 8:24-cv-01712-FWS-DFM
RESPONSE TO VERIFIED CONSOLIDATED PETITION TO COMPEL ARBITRATION AND FOR SANCTIONS

1

## **LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Epson America, Inc., certifies that this brief contains 6,999 words, which complies with the word limit of Local Rule 11-6.1.

DATED:  November 18, 2024          QUINN EMANUEL URQUHART & SULLIVAN, LLP


By _____*/s/ Shon Morgan*_____
Shon Morgan
Attorneys for Epson America, Inc.